**THE LAW OFFICES OF BRANDEE J. K. FARIA**
BRANDEE J. K. FARIA 6970
1164 Bishop Street, Suite 933
Honolulu, Hawai'i 96813
Telephone: (808) 523-2300
Facsimile: (808) 531-8898
E-mail: brandee@farialawfirm.com


Attorneys for Plaintiff GREG B. TULLY,
individually and on behalf of all others
similarly situated.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| GREG B. TULLY, individually and on behalf of all others similarly situated, | ) ) ) | CIVIL NO. 1-22-00032 LEK-WRP |
| | ) ) | **FIRST AMENDED CLASS ACTION COMPLAINT**; |
| Plaintiff, | ) ) | EXHIBITS "1"-"3". |
| vs. | ) ) | |
| FIDELITY BROKERAGE SERVICES LLC, | ) ) ) | |
| Defendant. | ) ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff, GREG B. TULLY ("Mr. TULLY" or "TULLY"), individually and

on behalf of himself and all persons similarly situated, sue Defendant, FIDELITY

BROKERAGE SERVICES LLC, and alleges as follows:

# **INTRODUCTION**

1.     This is a civil action seeking monetary damages, restitution, declaratory relief, and injunctive relief against Defendant, FIDELITY BROKERAGE SERVICES LLC ("FBS LLC"), arising from FBS LLC's routine disregard to good faith banking practices.

2.     Plaintiff brings this action on behalf of himself and all others similarly situated consumers against Defendant FBS LLC, arising from negligent authorization of fraudulent checks, withdrawals, and any other unauthorized activity from customer accounts.

3.     In general, financial institutions are governed by the Unform Commercial Code ("UCC") unless a provision within the account agreement states otherwise.

4.     Mr. TULLY signed his account application and agreement ("Account Agreement") in 1992 with FBS LLC. *Exhibit "1" Account Agreement.* The Account Agreement does not disclose or distinguish any provisions that overrule those of the UCC. The Account Agreement is the only document that Mr. TULLY has signed and agreed to since opening his account back in 1992. Thus, the Account Agreement is the only governing document for any and all of Mr. TULLY's accounts with FBS LLC.

5.     In addition, in a memorandum written by UMB BANK, N.A. ("UMB")

to Mr. TULLY, on behalf of FBS LLC dated April 19, 2021, they assert claims using

UCC § 3-406. *Exhibit "2" UMB Memorandum, p. 2.*

> Section 3-406 of the Uniform Commercial Code ("UCC")
> provides in pertinent part that "[a] person whose failure to
> exercise ordinary care substantially contributes to an
> alteration of an instrument or to the making of a forged
> signature on an instrument is precluded from asserting the
> alteration or the forgery against a person who, in good faith,
> pays the instrument or takes it for value or for collection."

> We believe that this provision of the UCC applies to bar any
> claim related to above-listed checks.

*Id. p. 2.*

6.     By the Defendant's usage and acknowledgment of UCC provisions, it

is certain that this matter is governed by applicable articles of the UCC.

7.     FBS LLC failed to maintain a standard duty of care in taking necessary

precautions, as established as industry standards, to protect its customers from

fraudulent activity on their accounts and failed to address such unauthorized activity

in a timely manner.

8.     From October 27, 2020, to November 27, 2020, FBS LLC processed,

approved and paid out funds associated with a number of unauthorized checks,

debits, and direct deposit withdrawals. These acts fell below the industry standards

and constituted negligence and lack of ordinary care by FBS LLC.

## PARTIES

9.     Plaintiff GREG B. TULLY is a resident and citizen of the City and

County of Honolulu, State of Hawai'i. Mr. TULLY has been an account holder at FBS LLC since 1992.

10.    Defendant FBS LLC is a financial service corporation based in Boston, Massachusetts. FBS LLC provides banking services to consumers, including Plaintiff and members of the putative class, which include authorizing account transactions and monitoring accounts for suspicious activity. Mr. TULLY's account was opened with FBS LLC at their Honolulu Office. FBS LLC has conducted business in Hawai'i through their Honolulu office from 1991-1999. Thus, Hawai'i consumers and individuals, like Mr. Tully had or still have accounts with FBS LLC.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction over Defendant and the claims set forth below because this cause is a cause not given by statute to other trial courts and the amount in controversy exceeds the jurisdictional minimum of this Court.

12.    Venue is proper in this Circuit pursuant to Hawaii Revised Statutes ("HRS") § 603-36(5) because Defendant is subject to personal jurisdiction here and regularly conducts business in this Circuit, and because all or a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in this Circuit.

## GENERAL ALLEGATIONS

## I.  FBS LLC NEGLIGENTLY AUTHORIZED FRAUDULENT ACTIVITY

13.     In general, banks are held liable for authorizing fraudulent activity on a customers account.

14.     In *Leather Mfrs.' Nat. Bank v. Morgan,* 117 U.S. 96, 6 S. Ct. 657, 29 L. Ed. 811 (1886), the court found that:

> Banks are bound to know the signatures of their customers, and they pay checks purporting to be drawn by them at their peril. If the bank pays forged checks it commits the first fault. It cannot visit the consequences upon the innocent depositor who, after the fact, is also deceived by the simulated paper

*Id.*

15.     FBS LLC, at all relevant times, had or should have had the capabilities to distinguish fraudulent activity from authorized activity. FBS LLC should have taken all necessary precautions to protect its customers at first signs and indication of any unusual activity.

16.     FBS LLC's lack of monitorization has caused tremendous financial grievances for its customers.

17.     The customers should not be subjected to losses resulting from FBS LLC's negligence while FBS LLC attempts to evade any financial liability it owes to its customers' accounts.

18.     FBS LLC neglects accountability and places total blame and

responsibility on account holders. It is inexcusable for financial institutions to disguise systematic flaws in their monitoring protocols as customer faults.

## A. PLAINTIFF TULLY'S EXPERIENCE

19.    On October 7, 2020, Mr. TULLY's house was burglarized. Immediately after burglary occurred Mr. TULLY noticed that his First Hawaiian Bank ("FHB") checks were stolen from his locked office, which is separate on his property from his home. Upon discovery of FHB stolen checks, Mr. TULLY notified FHB to close out his checking and savings accounts to transfer funds to new accounts with FHB.

20.    Mr. TULLY opened his accounts with FBS LLC in 1992 that were primarily focused on Index Mutual Funds where you would buy, reinvest, and hold investments with minimal trades. Since opening his account, Mr. TULLY has not made a single withdrawal. Mr. TULLY's FBS LLC accounts were opened almost 30 years ago, around the same time as when associated checks were issued. Being that Mr. TULLY is 74 years old and the checks were issued almost 30 years ago, it is reasonable that Mr. TULLY, at the time of the burglary, did not know that he was in possession of checks associated with his FBS LLC accounts.

21.    On October 27, 2020, the first forged check of many, #1057, was paid from Mr. TULLY's account for $2,000.

22.    Shortly after, FBS LLC cashed forged check #1043 on November 2, 2020 for $375 and again on November 20, 2020 for $2,378.91. FBS LLCfailed to recognize that they cashed the same check number twice. FBS LLC by now, at the very least, should have known that Mr. TULLY's account was subject to suspicious activity. However, it was not until November 24, 2020 with the sixteenth fraudulent check that FBS LLC finally decided to notify Mr. TULLY.

23.    As of November 23, 2020, fifteen (15) checks and three (3) direct deposits were paid on Mr. TULLY's FBS LLC account. FBS LLC, upon their own discretion, transferred funds from Mr. TULLY's Core Account FTEXX to his money market account to cover check #1063 for $5,000, creating a Margin Account without Mr. TULLY's consent. FBS LLC was using the Margin Account to cover amounts for forged checks. With each forged check, the balance increased on the Margin Account. FBS LLC would then collect interest on that balance. Thus, every time the balance increased the interest earnings by FBS LLC also increased.

24.    FBS LLC unjustly benefited from the Margin Account they opened in Mr. TULLY's name. FBS LLC intentionally ran up Mr. TULLY's balance on the Margin Account and continued to collect interest on that balance, a balance Mr. TULLY would have never agreed to or accumulated on his own.

25.    For almost 30 years, Mr. TULLY has not once needed to open a Margin Account nor has made any inquiries about opening a Margin Account. Again, FBS

LLC found a way to gain from the situation, receiving monetary profits from the fraud occurring on Mr. TULLY's account. FBS LLC paid out obvious forgeries and benefited from approving them. FBS LLC purposefully intended to ignore obvious signs of suspicious activity on Mr. TULLY's accounts so that they could continue to benefit without taking any reasonable actions to rectify the situation.

26.    FBS LLC first notified Mr. TULLY of unauthorized account activity by email, phone call, and letter dated November 24, 2020, notifying Mr. TULLY that FBS LLC was unable to honor check #1072 for $25,000, because the signature did not match their records. During this initial correspondence, FBS LLC not once notified Mr. TULLY that other withdrawals have been made on his account prior to November 23, 2020.

27.    Even after November 24, 2020, three more withdrawals were paid from Mr. TULLY's account.

28.    FBS LLC notified Mr. TULLY for suspicious activity related to check #1072 but that same basic ordinary care was not established for the fifteen checks and three direct deposits prior to check #1072.

29.    On January 20, 2021 Mr. TULLY received a letter from FBS LLC which enclosed a copy of Check #1057 that was paid on October 27, 2020. It is very clear and obvious to any individual, but especially those trained and tasked with the responsibility to approve or reject these transactions, that the signature on

check #1057 did not remotely resemble Mr. TULLY's actual signature on file. If FBS LLC exercised proper care in verifying the signature on the checks with Mr. TULLY's signature on file they would have been immediately aware that the checks were forged and were not properly payable.

30.    It is certain that FBS LLC did not attempt to match, compare, or verify the signature on checks prior to check #1072 and continued to fail in its duty to prevent fraud.

31.    Over a span of one month, FBS LLC paid out $90,126.79 through seventeen checks and five direct deposits from Mr. TULLY's accounts.

32.    On December 23, 2020, FBS LLC was able to recover $30,575.22 from unauthorized direct deposits.

33.    On, April 23, 2021, FBS LLC credited back Mr. TULLY's account for $12,077.93, what they were able to recover of the $59,503.91 in forged checks.

34.    As of August 10, 2021, Mr. TULLY has accumulated a total loss of $49,386.05 as a result of FBS LLC's systematic negligence and complete disregard to a standard duty of care. *Exhibit "3" Account Reconciliation.* FBS LLC refuses to reimburse Mr. TULLY for his total losses and denies responsibility in this matter.

35.    For almost 30 years Mr. TULLY has had no history of withdrawing from his account by method of debit, direct deposit, or check. Any reasonable person, especially those responsible and trained for monitoring banking transactions,

would be well aware that any withdrawal on an account, with no prior history of withdrawals for over 20 years, should be red flagged as suspicious and unusual activity.

36.     FBS LLC, at all relevant times, had the capabilities to use their own discretion, like they did with transferring Mr. TULLY's funds from one account to the other without his permission, to take necessary precautions on Mr. TULLY's account to prevent illegal activity from continuing. Prior to check #1072, FBS LLC made no attempts to safeguard Mr. TULLY's account.

37.     FBS LLC countlessly failed to take accountability in its actions at the expense of its customers. FBS LLC, alone, has depleted Mr. TULLY's accounts by approving fraudulent withdrawals. Mr. TULLY should not suffer because of FBS LLC's continuous neglect of responsibility.

**B. FBS LLC IMPROPERLY RELIES ON 2020 CUSTOMER AGREEMENT**

38.     FBS LLC falsely claims that Mr. TULLY has breached FBS LLC's "Terms and Conditions, which require shareholders to notify and/or inform FBS LLC immediately if any of their checks are stolen or missing". *Exhibit "2", p. 2.*

39.     FBS LLC improperly relies on a Customer Agreement updated by FBS LLC, without Mr. TULLY's consent, agreeance, or signature, in 2020. Mr. TULLY did not sign this agreement and thus the Account Agreement from 1992 remains as

the governing terms and conditions for Mr. TULLY's accounts with FBS LLC.

40.    FBS LLC now claims that immediately would have been right after the burglary occurred. Immediately after the burglary Mr. TULLY undertook all reasonable efforts to notify the appropriate authorities and institutions.

41.    Additionally, it was not until the first check was drawn on October 27, 2020 that there could have been any discrepancies or suspicious occurrences on Mr. TULLY's account. At the time of the burglary no such occurrences were evident.

42.    Mr. TULLY appropriately notified FBS LLC immediately once he noticed and was made aware of any incorrect or suspicious account activity.

43.    Even if "immediately" was the governing provision, which it is not, the term "immediately" is not clear, is insufficient, and leaves too much opportunity for subjective interpretation. FBS LLC did not describe what defines immediately nor did not elaborate with a specified number of days allowed to customers to report fraud.

44.    With unclear terms we must also rely on industry standards and UCC provisions to determine a reasonable time frame to report fraudulent activity.

## C. <u>RELEVANT UCC PROVISIONS</u>

45.    UCC § 4-406, states that a customer must be "afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank." *See*, § 4-406. Customer's Duty to Discover and Report

Unauthorized Signature or Alteration., Unif. Commercial Code § 4-406; Mass. Gen. Laws Ann. ch. 106, § 4-406 (West).

46.    Based on these relevant provisions, it is certain that 30 days from the release of statement must be allowed to customers to notice and report unauthorized activity on their accounts. *See, Designer Direct, Inc. v. PNC Fin. Servs. Grp., Inc.,* No. 17-CV-7345, 2019 WL 1002605 (N.D. Ill. Feb. 28, 2019); *Union St. Corridor-Cmty. Dev. Corp. v. Santander Bank, N.A.*, 191 F. Supp. 3d 147 (D. Mass. 2016); *Kaplan v. JPMorgan Chase Bank, N.A.,* No. 14 C 5720, 2015 WL 2358240 (N.D. Ill. May 12, 2015).

47.    The first check was paid from Mr. TULLY's account on October 27, 2020, which was included in a paper statement that was mailed and received by Mr. TULLY on or around November 5, 2020.

48.    FBS LLC agrees that during a November 26, 2020, call with Mr. TULLY he reported that the associated withdrawals were not made by him and that the checks were stolen from his home during a recent burglary. Mr. TULLY reiterated fraud on his account in email dated December 9, 2020.

49.    Mr. TULLY fully complied with banking standards and UCC provisions by notifying FBS LLC of fraudulent activity within 30 days of the release of the statements that included the unauthorized transactions. Since Mr. TULLY notified FBS LLC of unauthorized transactions within the 30-day statutory

timeframe from the release of statement the liability falls on FBS LLC.

50.    After notifying FBS LLC of theft on November 26, 2020, and in a timely manner, Mr. TULLY continued to do his due diligence by promptly following protocol as instructed by Tony Ullrich, who works for FBS LLC's intelligence unit and acted as the main point of contact handling Mr. TULLY's case.

51.    Mr. TULLY completed fraudulent item affidavits for unauthorized checks, filed police reports associated with fraudulent activity, and submitted appropriate supplemental claims all within the month of December 2020. It wasn't until March 1, 2021, two months later, that FBS LLC confirmed that appropriate documentation was received and retrieval efforts were in progress.

52.    FBS LLC failed to take any reasonable attempts in protecting and safeguarding Mr. TULLY's account. Without any visible efforts on FBS LLC's part, Mr. TULLY had to take initiative to try and prevent any further unauthorized withdrawals on his own.

53.    Mr. TULLY made numerous requests to have his existing accounts closed and funds transferred to a new account to protect from further fraud. Although FBS LLC put a restriction on his account, Mr. TULLY requested the account be closed and funds transferred to a new FBS LLC account, which was only accomplished after the fourth request and on December 28, 2020. Again, Mr.

TULLY did his due diligence. It was FBS LLC who continuously neglected and denied any of Mr. TULLY's attempts to prevent further fraud.

54.    UMB, on behalf of FBS LLC claims that UCC § 3-406 applies in support that Mr. TULLY substantially contributed to the fraudulent activity on his account. FBS LLC claims that if "the theft of the checks been reported to [FBS LLC] sooner, the loss would have been avoided."  FBS LLC claims that because Mr. TULLY did not report the stolen checks immediately after his locked home office was burglarized, he is barred from any claims related to forged checks on his account for contributing to the fraud. *Exhibit "2", p. 2.*

55.    Mr. TULLY was issued these checks almost 30 years ago and has never authorized a check on his FBS LLC accounts.  If he had known he was in possession of FBS LLC checks he would have notified FBS LLC sooner, like he did with FHB. It is reasonable that a 74-year-old elderly man is not able to recall checks issued to him in 1992, and thus, in good faith, he took all the necessary precautions to his best ability.

56.    It wasn't until April 19, 2021, over 125 days since Mr. TULLY first contacted FBS LLC, that they credited back Mr. TULLY's account for $12,077.93, only a portion of what was still owed to him.

57.    Mr. TULLY, as the customer, did his due diligence in a timely manner. It was FBS LLC who took four months to make any substantial efforts in

retrieving Mr. TULLY's funds. If FBS LLC acted "sooner, the loss would have been avoided." *Id., p. 2.* Instead of taking responsibility, they are blaming Mr. TULLY for their complete disregard for time and the severity of the situation.

58.     In addition, courts have found that defense of subsequent negligence of the depositor "assumes that the bank itself has not been guilty of negligence in making the payment, for when by the exercise of proper care, it could have discovered the alteration or forgery, it must bear the loss notwithstanding that the depositor failed in his duty to examine the accounts." See, *Basch v. Bank of America Nat. Trust & Savings Ass'n,* 22 Cal.2d 316 (CA. 1943) *Glassell Dev. Co. v. Citizens' Nat. Bank of Los Angeles,* 191 Cal. 375, 216 P. 1012 (1923). Even though Mr. TULLY examined his account statements within the 30 days, if he did not, FBS LLC's negligence supersedes any claims relying on contributory negligence of Mr. TULLY.

59.     FBS LLC did not verify signatures on checks, waited three months after retrieving necessary documents to take any action in this matter, and did not exercise ordinary care in recognizing and preventing unusual and suspicious activity on Mr. TULLY's account.

60.     Therefore, the fraud on Mr. TULLY's account was at no fault of Mr. TULLY, and even if Mr. TULLY contributed to the fraud, the liability would still fall on FBS LLC due to their negligence. FBS LLC authorized forged checks and

failed to exercise ordinary care thus under relevant law and authority, FBS LLC is responsible for reimbursing Mr. TULLY for amounts associated with fraudulent activity.

## CLASS ALLEGATIONS

61.    Plaintiff brings this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Hawai'i Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

62.    The proposed Class is defined as:

> Residents of the State of Hawai'i who were FBS LLC account holders within the applicable statute of limitations and incurred injuries or damages as a result of FBS LLC's unauthorized payment of checks, ACH transfers, and direct debits.

63.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

64.    Excluded from the Class are FBS LLC, its parents, subsidiaries, affiliates, officers and directors, any entity in which FBS LLC has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their

immediate family members.

65.    The members of the Class are so numerous that joinder is impractical. The Class consist of thousands of members, the identity of who is within the knowledge of and can be ascertained only by resort to FBS LLC's records.

66.    The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all Class members, incurred losses by FBS LLC's negligent authorization of fraudulent activity.   The representative Plaintiff, like all Class members, has been damaged by FBS LLC's lack of ordinary care in that they have been improperly and ineffectively monitoring customer accounts for suspicious activity.   Furthermore, the factual basis of FBS LLC's negligence is common to all Class members and represents a common thread of unfair conduct resulting in injury to all members of the Class.

67.    There are numerous questions of law and fact common to the Class, and those common questions predominate over any questions affecting only individual Class members.

68.    Among the questions of law and fact common to the Class are whether:

a.    FBS LLC systematically fail to exercise ordinary care in monitoring customer accounts.

b.    Plaintiff and other members of the Class have sustained damages as a result of FBS LLC's protocol and conduct, and the proper measure of damages.

69.    Plaintiff' claims are typical of the claims of other Class members, in that they arise out of the same negligent policies and practices of FBS LLC.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

70.    Plaintiff is committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiff is an adequate representatives and will fairly and adequately protect the interests of the Class.

71.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of FBS LLC, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and FBS LLC's conduct will proceed without remedy.

72.    Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create

the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

73.    FBS LLC has acted or refused to act on grounds generally applicable to Plaintiff and other members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief, as described below, with respect to the Class as a whole.

## FIRST CLAIM FOR RELIEF
## VIOLATIONS OF HAWAII REVISED STATUTES, CHAPTER 480
## UNFAIR OR DECEPTIVE ACTS OR PRACTICES

74.    Plaintiff GREG TULLY incorporates the preceding allegations by reference as if fully set forth herein.

75.    This claim is asserted on behalf of the members of the Class pursuant to HRS § 480, *et seq*.

76.    Plaintiff is a consumer as defined by HRS § 480-1.

77.    HRS § 480-2(a), declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

78.    FBS LLC violated HRS Chapter 480 and specifically § 480-2(a), by the conduct alleged above including, but not limited to, employing the unfair and

deceptive acts and practices set forth herein.

79.    FBS LLC has unfairly and deceptively neglected its duty of care and has falsely insinuated that such ordinary care is the sole responsibility of its customers.

80.    FBS LLC has unlawfully denied reimbursement of the stolen fund that they wrongfully authorized and falsely misplaces liability on the Plaintiff and proposed class.

81.    As redress for FBS LLC's repeated and ongoing violations of HRS § 480-2(a), Plaintiff and the Class are entitled to, inter alia, damages, reasonable attorneys' fees and costs, and declaratory relief, pursuant to HRS § 480-13.

## SECOND CLAIM FOR RELIEF
## <u>NEGLIGENCE</u>

82.    Plaintiff GREG TULLY incorporates the preceding allegations by reference as if fully set forth herein.

83.    This claim is asserted on behalf of the members of the proposed Class pursuant to HRS § 657-1.

84.    FBS LLC, as an incorporated banking and investment institution, owed a duty of care in monitoring and safeguarding customer accounts to be protected against fraudulent and unauthorized activity.

85.    FBS LLC failed to notice obvious red flags and signals of suspicious activity on its customers' accounts, failed to verify signatures with the account holders' actual signatures on file, failed to notify account holders of suspicious activity in a timely manner, and failed to make necessary attempts in retrieving unauthorized withdrawals in a reasonable time period.

86.    FBS LLC breached its duty of care to the Plaintiff and to the proposed class.

87.    FBS LLC deviated from the industry standards and standard duty of care, causing monetary losses on its customers' accounts.

88.    Thus, FBS LLC's actions and inactions fell below the standard of care reasonably expected from a well-established financial institution.

89.    As a result of FBS LLC's breaches of its duties of due care, as detailed

above, the Plaintiff and proposed class have suffered damages in amounts to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class demand a trial on all claims so triable and judgment as follows:

1.  That the Court certify this matter as a Class Action pursuant to Rule 23(b)(2) and 23(b)(3);

2.  That the Court designate Plaintiff Greg Tully, individually and on behalf of all others similarly situated, as Class Representative;

3.  For judgment against Defendants, jointly and severally, declaring that the wrongful conduct collectively alleged herein was and is unfair and deceptive trade practice pursuant to HRS Chapter 480-2.

4.  The Plaintiff and the Class be awarded compensatory damages in an amount to be proven at trial trebled under HRS Chapter 480-13, together with pre-judgment interest as provided by law;

5.  The Plaintiff and the Class be awarded compensatory damages in an amount to be proven at trial double under HRS Chapter 388, together with pre-judgment interest as provided by law;

6.  That the Court award punitive damages against Defendant to the extent permitted by law;

7.      That the Court award expense of suit, including all attorneys' fees and costs incurred by Plaintiff and the Class Members as may be provided by law;

8.      That the Court award general damages against Defendant in an amount to be determined at trial;

9.      That the Court award special damages against Defendant in an amount to be determined at trial;

10.     That the Court award nominal damages against Defendant in an amount to be determined at trial;

11.     That the Court issue an order of disgorgement and/or restitution of all monies received by Defendant as a result of their wrongful and/or unfair or deceptive acts or practices in an amount to be proven at trial; and

12.     That the Court award such other and further relief as it may deem just and proper under the applicable law.


DATED: Honolulu, Hawaii, February 14, 2022


                                        */s/ Brandee J.K. Faria*
                                        _____
                                        BRANDEE J.K. FARIA

                                        Attorneys for Plaintiff
                                        GREG TULLY,
                                        individually and on behalf
                                        of all others similarly situated